UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICAH WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. 1:09-cv-1183-TWP-DML |
| | ) | |
| JUDITH LOVCHIK, | ) | |
| JUDITH MONROE, | ) | |
| INDIANA STATE DEPARTMENT OF | ) | |
| HEALTH, | ) | |
| MITCH DANIELS, | ) | |
| STATE OF INDIANA, | ) | |
| GREGORY N. LARKIN M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants' – Indiana State Department of Health

("ISDH"), Commissioner of ISDH Judith Monroe, Laboratory Director of ISDH Judith Lovchik,

Governor Mitch Daniels, State of Indiana, and Gregory N. Larkin, M.D. (collectively,

"Defendants") – Motion for Summary Judgment.  Plaintiff Micah Williams ("Williams") was a

division director of quality assurance at the ISDH.  His supervisor was lab director Judith

Lovchik ("Lovchik").  According to Williams, Lovchik and the ISDH discriminated and

retaliated against him in various unlawful ways.  In this lawsuit, Williams brings an array of

claims against the Defendants, including federal claims under 42 U.S.C. §§ 1981, 1983, 1985,

1986, Title VII, and a state claim for defamation.  Oral argument was heard on November 15,

2011. For the reasons set forth below, Defendants' Motion for Summary Judgment (Dkt. 58) is

**GRANTED** in part and **DENIED** in part.

# I.  BACKGROUND[1]

## A.  Williams begins working at ISDH

Williams, an African-American male, has a Bachelor of Science degree in microbiology with a medical technology emphasis from Northern Arizona University and a Master of Natural Science degree in microbiology and genetics from Arizona State University.  In the past, Williams has worked for the New Jersey Department of Health, the Centers of Disease Control in Arizona, BioGuard Industries in Arizona, Sonora Quest Laboratories in Arizona, and St. Luke Medical Center in Arizona.  In 2007, Williams applied with the ISDH and was hired as the division director of quality assurance.  Williams described his job duties as follows: "to produce quality and maintain a steady level of improvement on all operational and testing methodologies in the [ISDH]."  Williams started this job making $82,600.00.  His supervisor was Dr. Robert Lindner, the lab director at ISDH.

---

[1]  Plaintiff's counsel needlessly complicated the Court's task of summarizing the relevant facts.  Local Rule 56.1(b) requires non-movants to include a "Statement of Material Facts in Dispute" that responds to the movant's asserted material facts "by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment." L.R. 56.1(b).  Rather than identifying potential factual disputes in a concise fashion, Plaintiff's counsel unfurled an 18-page narrative that is replete with argument and a 15-page surreply that is no better as it contains a great deal of immaterial information. (Dkt. 73 at 13) ("Perhaps Defendants would prefer the Court to require Plaintiff to use the unduly prolix and passive voice that most grammarians find to be an anathema to the Plain English movement that started in the Michigan Bar some 25 years ago."); (Dkt. 73 at 7) ("There is no need to root around like a pig searching for a mushroom, only to use a mouse to click on the relevant portion of a deposition transcript.").  And, for reasons that remain unclear, the brief devotes a paragraph to explaining the 15th century origin of the phrase "cat's paw," a legal doctrine that is inapplicable to the present matter. (Dkt. 73 at 2-3).  Accordingly, the Court had unnecessary difficulty excising the arguments from the facts when piecing together the background section.

**B.  Williams' supervisory duties and work environment at ISDH**

In February 2008, Dr. Lindner left ISDH and was replaced by Dr. Judith Lovchik, a Caucasian female with a Ph.D. in medical microbiology.  Around this time, one of the deputy directors in the laboratory, Dave Nauth ("Nauth") – a Caucasian in charge of containers, glassware, clerical staff, and central accessing – was reassigned to a different division.  After reviewing the relevant supervisory duties, Lovchik transferred Nauth's responsibilities and his roughly 18 employees to Williams.  This transfer increased the number of "direct reports" to Williams threefold, from 9 to 27.  Lovchik testified by way of affidavit that she "reassigned the staff to [Williams] with the expectation that [Williams] would reorganize these areas into a hierarchical structure that would result in fewer direct reports to him."  In her deposition, Lovchik similarly testified that "I didn't intend for them to remain direct reports.  It was for [Williams] to reorganize as he saw fit."

Notably, in these areas, most of the staff members were African-American.  Specifically, Williams testified that in the glassware and containers sections, 100% of the employees were African-American; in the clerical section, four of the six employees were African-American; and, in the central accessioning section, 50% of the employees were African-American.  Moreover, around this time, Lovchik also removed Caucasian supervisor, Diana Zamani, who supervised the clerical staff.  As a result, the clerical staff reported directly to Williams.  On this point, Williams testified that he believes the organizational realignment was racially motivated:

"that Dr. [Lovchik] thinks that blacks are better supervised by blacks." Lovchik, of course, denies that the realignment had anything to do with race.[2]

Moreover, at some point (it is unclear when), Lovchik placed the other African-American employees who were not under Williams' supervision (Louis Douglas, Nicole Sims, and Cynthia Thomas) under the direction of other African-American supervisors (Hesham Eligaali and Tokaya Hogan). On this point, counsel for Plaintiff asked Lovchik if the organizational changes she made resulted in African-American employees being supervised exclusively by African-American supervisors. Lovchik responded, "[t]hat's the way it turned out, in fact. Prior to my being there, we didn't have any African-American supervisors that they could have been supervised by. But . . . Hesham came while I was there, under my direction." Lovchik then testified that "[n]one of these changes were made for racial reasons."

### C. Williams' relationship with Lovchik

Williams and Lovchik, who often did not see eye-to-eye and from the beginning, had a rocky relationship. At some point in 2008, though, Williams asked Lovchik to write a reference letter for him because he was going to seek another job. Lovchik drafted the letter on July 31, 2008. The letter highlighted Williams' responsibilities in the laboratory and described him as an

---

[2] In his affidavit, Williams testified that "Defendant Lovchik expressed her view to me that African-American employees are best supervised by other African-Americans." (Dkt. 67-13, ¶ 9). Significantly, though, this statement is seemingly contradicted by Williams' earlier deposition testimony. In his deposition, Williams asserted his belief that Dr. Lovchik believed that "blacks are better supervised by blacks." He was then asked the following: "Did [Lovchik] make any comment of that nature when she discussed the change in supervision with you?" He responded, "[o]f course not, no." It is well-settled that a plaintiff cannot defeat summary judgment by "contradicting deposition testimony with later-filed contradictory affidavits." *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 908 (7th Cir. 2010) (citation and internal quotations omitted). Accordingly, the Court may not consider this statement contained in Williams' affidavit.

"enthusiastic, energetic leader who networks well both inside and outside the agency."

According to Lovchik, the letter was an accurate representation of Williams' responsibilities in

the laboratory. When asked about the letter in her deposition, Lovchik responded, "I don't think

I really addressed his job performance. I tried to say positive things that were true about

[Williams], because he had asked me to write the letter so that he would have a better chance of

getting alternative employment."

Sometime in roughly the summer of 2008, Williams made a suggestion with respect to

complying with the Clinical Laboratory Improvement Act ("CLIA") by collecting and

organizing resumes and other credentials of lab department testing employees. Lovchik stated

her strong opposition to the proposal, rejecting it as "bullshit." Despite Lovchik's rebuke,

Williams implemented the proposal. In the summer of 2008, a CLIA audit took place, which the

laboratory successfully passed. The CLIA auditor specifically inspected the compilation of

resumes and other credentials of the lab department testing employees (i.e. the very proposal that

Williams suggested and implemented). During her deposition, Lovchik conceded that "it was

because of [Williams'] initiative" that CLIA compliance was accomplished.

Chris Grimes ("Grimes"), one of Williams' coworkers, stated by way of affidavit that, at

times, Lovchik "misattributed [Williams'] accomplishments to me." Specifically, in a

conversation with the CLIA auditor, Lovchik gave Grimes credit for things that Williams had

actually done. When Grimes tried to correct her, "Lovchik stopped me in the middle of my

attempt."[3] Following the passage of the CLIA audit, the auditor wrote a letter to Lovchik,

---

[3] Grimes also testified that he witnessed Lovchik exhibit a demeaning attitude towards Williams'
ideas, even though the ideas "had validity."

making a series of complimentary comments about the laboratory. In the letter, the auditor singled out Williams as "very knowledgeable," having "great people skills," being "very supportive," and that he would "greatly enhance and resolve [quality assurance] issues as they present themselves at the ISDH laboratory."

### D. Lovchik attempts to reduce Williams' salary; Williams files EEOC charge

Soon after Lovchik assumed the helm of lab director, numerous employees complained that Williams was earning a disproportionately high salary. Indeed, there was a salary disparity among the division directors, and Williams made more than his counterparts. At the time Lovchik noticed this disparity, there were three other division directors, all of whom were Caucasian: David Dotson, Thomas Cronau, and Craig Hinshaw.

Dotson, who had a Master's degrees and more than 30 years experience at ISDH, made $70,940.22. Cronau, who also had a Master's degrees and more than 30 years experience at ISDH, made $66,842.88. Hinshaw, who had a bachelor's degree and roughly 40 years experience at ISDH, made $71,422.46.[4] By this time, Williams was earning $83,908.50.

In Plaintiff's counsel's statement of facts, he claims that there was a good reason for Williams' higher salary: That is, Williams' "background, credentials, and skill sets were so exemplary as to justify a pay rate well above the predetermined guidelines that otherwise would have applied to someone without his extraordinary background." (Dkt. 67 at 2).[5] It is unclear if there is any evidentiary support for this position. In any event, Lovchik didn't see it this way.

---

[4] In November 2008, Lixia Liu, an Asian female with a Ph.D., became a division director in the laboratory, where she earned a salary of $75,278.58.

[5] It is worth noting that Williams appeared to have more employees reporting directly to him than other division directors.

Based on the salary differences, and considering factors like experience and education, Lovchik concluded that Williams was overpaid. By way of affidavit, Lovchik testified that "it was my opinion that [Williams'] salary should be reduced in order to create parity between the salaries of the directors." To effectuate this plan, Lovchik spoke to her supervisor, the Assistant Commissioner of ISDH, Lance Rhodes.

On or about August 7, 2008, a meeting was held with Williams, Lovchik, and Joe Fox to discuss reducing Williams' salary. During this meeting, Lovchik proposed cutting Williams' salary down to what Thomas Cranau was making ($66,842.88). One day after the meeting, on August 8, 2008, Williams filed a charge of discrimination with the EEOC, based on three complaints. First, in light of the staffing realignment, Williams was saddled with more responsibilities and employees to supervise. Second, following the realignment, Williams supervised nearly all of the African-American employees at ISDH, which fomented "polarization" and "an uncomfortable work environment." Third, Lovchik proposed reducing his salary by roughly $17,000. Williams concluded that he felt that his employer was "trying to force me out of my position, as the only African-American director." Notably, in late August 2008 following Williams' EEOC charge, Geoffrey Jackson, a coworker of Lovchik, met with her and discussed various personnel matters. During the conversation, Lovchik stated that Williams' "chickens will come home to roost."

Williams' EEOC charge prompted an investigation from the ISDH's human resources department. Plaintiff submitted a *draft* version of the report into evidence. The report began by assessing the quality of the work environment at the laboratory. Simply stated, the lab was an unpleasant place to work. The majority of the employees, presumably relishing the opportunity

to describe their workplace with impunity, disparaged the laboratory as "terrible," "oppressive," "depressing," "fragmented," and, last but not least, "crappy." Employees also complained that, in effect, "African-Americans are put into their own little bunch." The report also detailed inappropriate age-related comments and other forms of office dysfunction. Many of the negative comments were directed squarely at Lovchik. The report also listed various positive and negative comments about Williams. Finally, the report concluded that the office environment was "toxic" and recognized that "the organizational changes made by Dr. Lovchik have shown a gravitation of the majority of African-American lab employees being put under Micah Williams." Therefore, ISDH's practices could create legal concerns under Title VII.

Sometime before September 25, 2008, Williams met with Lance Rhodes, who informed Williams that his salary would not be reduced. According to Williams, however, Rhodes told Williams that his position would be eliminated on December 15, 2008. Moreover, according to Williams, Rhodes asked for his resignation on five separate occasions during the course of their meeting.

### E. Williams transfers

On November 24, 2008, Williams was transferred to the Public Health Preparedness and Emergency Response ("PHPER") division of ISDH. Lovchik recommended Williams to Gary Couch ("Couch"), the director of PHPER, for this position, testifying that "I told Gary that I thought [Williams] would do very well in his division because he was very enthusiastic about preparedness." Couch informed Williams that he had been transferred because his job as division director was not supported by the Public Health Emergency Preparedness Grant.

After Williams left the lab, Grimes, one of Williams' former coworker (described above), assumed some of Williams' former duties. According to Grimes, the explanation given by Couch regarding the Public Health Emergency Preparedness Grant does not make sense. Specifically, in his affidavit, Grimes stated that after assuming Williams' duties, he "was paid from the same funding source as [Williams] was." Grimes further noted that "[t]his source . . . should have been available to fund those same responsibilities no matter who performed them, whether performed by [Williams] or another State Department of Health Lab Employee."

Following his transfer, Williams did not supervise any employees. In the fact section of his response, Plaintiff's counsel colorfully describes the new position as one "without apparent responsibilities, in the equivalent of a broom closet." (Dkt. 67 at 19). Indeed, in her deposition, Lovchik conceded that that the transfer had the effect of removing all of Williams' "supervisory responsibilities within the lab." In his affidavit, Williams testified that after he was reassigned away from the laboratory, he "was isolated from ISDH staff in the same department, among boxes in the corner, on a floor separate from coworkers, and provided no assignments for several weeks at a time." Further, Williams noted that his new job "had no job description" and that he "was given no instruction as to . . . job duties." Williams also moved from an office that was "15 feet by 15 feet office" to a "five foot by five foot cubicle, surrounded by moving boxes."

**F. Recent events and miscellaneous facts**

At some point in 2009, Williams received a performance evaluation based on his performance for the period January 1, 2008 to December 31, 2008. Because Lovchik had been Williams' supervisor for the vast majority of 2008, she provided much of the input. In the evaluation, Lovchik determined that Williams did not meet expectations with regard to job

knowledge and customer service. However, Williams met expectations with respect to teamwork, communication, and drive for results. In the "overall performance rating" section, Lovchik indicated that Williams "does not meet expectations."

Among other things, Lovchik opined that Williams did not understand the importance of developing a standard format for writing standard operating procedures within the laboratory. Moreover, Lovchik opined that Williams did not meet expectations with regard to his "coordination of the update of laboratory COOP [i.e. contingency plan in the event of the disaster] or his reorganization of support staff." According to Lovchik, once Williams received Nauth's responsibilities and employees, he should have reduced the number of individuals who reported directly to him, which would have saved money and increased efficiency by streamlining operations. Williams failed to do so. Additionally, during a 2008 inspection, the ISDH laboratory was cited for failing to have its quality assurance manual signed by the laboratory director. This task, according to Lovchik, was Williams' responsibility, and his failure to complete it adversely affected Lovchik's opinion of his job performance. In response to this negative evaluation, Williams submitted a rebuttal. Without delving too deeply into the weeds, suffice it to say that Williams met each charge head-on, asserting that most, if not all, of Lovchik's criticisms were misleading.

On July 17, 2009, Williams filed a second charge of discrimination with the EEOC, stating that he had been retaliated against for filing a previous EEOC charge. Specifically, Williams claimed he had been unlawfully retaliated against in numerous ways, including: (1) Williams was disciplined in the form of a letter of counseling; (2) ISDH did not consider the results of the human resource department's investigation, but instead lent credence to Lovchik's

version of events; (3) Williams received an unfair performance evaluation; (4) ISDH's refusal to consider remedial measures; (5) Williams' reassignment out of the laboratory, which, in his view, would impede his ability to obtain "promotional opportunities, advancements, wage increases, or transfers."

Also relevant to this dispute, it is worth noting that Lovchik made at least two statements to Williams during his employment with ISDH which he considered to be racially-charged. First, while talking to Williams, Lovchik expressed concerns about the lack of supervision over Cindy Thompson, an African-American ISDH employee who worked in the basement of the laboratory. Lovchik stated that it was unclear what Thompson was doing and that "for all we know, she could be turning tricks down there." Second, while speaking with Williams in his office, Lovchik noticed a picture of Williams' children and remarked "oh, your children are black" and then proceeded to relay a story a friend had told her about his children. In her deposition, Lovchik described the incident as follows: "It reminded me of what I thought was a charming, humorous story that an African-American friend had told me about his children, and when I saw [Williams'] cute children in that picture, it reminded me of the story." Plaintiff suggests that this statement was prompted by the fact that Williams is married to a Caucasian, making his children bi-racial.

In January 2011, years after this case was filed, Williams' position with ISDH was eliminated and he was laid off. Importantly, though, his discharge is not at issue in the present lawsuit. Finally, it is worth emphasizing that during the duration of his tenure at ISDH, Williams' salary was never reduced. Additional facts are added below as needed.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party=s favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).  Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III.    DISCUSSION

To reiterate, Williams' Amended Complaint brings federal claims against Defendants for violations of 42 U.S.C. §§ 1981, 1983, 1985, 1986, and Title VII.  Williams also brings a state claim for defamation.

## A.  Waived arguments

In his response brief, Plaintiff did not address Defendants' arguments relating to 42 U.S.C. §§ 1983, 1985, and 1986.  By failing to do so, Plaintiff has waived these arguments and summary judgment must be entered with respect to these claims. *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (arguments not presented to the district court in response to summary judgment motions are waived).  Accordingly, summary judgment is **GRANTED** with respect to Plaintiff's claims under 42 U.S.C. §§ 1983, 1985, and 1986.

## B.  Defamation

Plaintiff's state law claim for defamation requires little discussion.  In light of Plaintiff's failure to file the requisite notice of tort claim, Plaintiff's defamation claim against ISDH, an agency of the State, is procedurally barred. *See* Ind. Code § 34-13-3-6(a); *Davidson v. Perron*, 716 N.E.2d 29, 34 (Ind. Ct. App. 1999) (compliance with the Indiana Tort Claims Act is a procedural precedent for taking claims to trial).

Moreover, Plaintiff's defamation claim against Lovchik fails because Lovchik's statements are protected by qualified privilege, given her responsibility of evaluating Williams' work performance. *See Board of School Commissioners of City of Indianapolis v. Pettigrew*, 851 N.E.2d 326, 331 (Ind. Ct. App. 2006) ("Intracompany communications regarding the fitness of en employee are protected by the qualified privilege, in order to accommodate the important role of free and open intracompany communications and legitimate human resource management needs.") (citation omitted).  Significantly, "[t]he privilege protects personnel evaluation information communicated in good faith." *Id.* (citation omitted).  Unfortunately, Williams' response brief did not meaningfully address Defendants' argument that Lovchik is entitled to

qualified privilege.  Because "[t]he plaintiff . . . has the burden of overcoming [qualified] privilege by showing that it has been abused," *id.*, summary judgment must be **GRANTED** with respect to Plaintiff's defamation claim.

**C.  Remaining claims – Title VII and 42 U.S.C. § 1981**

The heart of Williams' allegations relate to race discrimination and retaliation.  As an initial housekeeping matter, it is worth noting that Williams' discrimination and retaliation claims are brought under both Title VII and § 1981.  From a practical standpoint, this is a distinction without a difference.  These claims, although brought under different statutes, are functionally identical; therefore, the same analysis will apply. *See Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) ("our analysis will apply equally to his claims under § 1981 and Title VII"); *O'Leary v. Accretive Health, Inc.*, -- F.3d --, 2011 WL 4375684, at *4 (7th Cir. Sept. 21, 2011) (§ 1981 prohibits race discrimination and retaliation for opposing discriminatory practices).  Williams' race discrimination claims and his retaliation claims are addressed in turn below.

**D.  Race Discrimination**

**1.  *General Principles***

It is well-established that a plaintiff may prove discrimination in one of two ways: either through direct evidence, or indirectly through the burden-shifting mechanism of *McDonnell Douglas*. *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000) (citation omitted).  A brief review of each is instructive.

Under the direct method, a plaintiff may proffer direct or circumstantial evidence to prove discrimination.  Direct evidence establishes "the fact in question without reliance on

inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (citation omitted). Such evidence is rare. After all, even the most heedless employer is unlikely to make such overt and damning admissions. Nonetheless, a plaintiff can still prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citation and internal quotations omitted). "That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Id*. (citation and internal quotations omitted).

Alternatively, a plaintiff can use the indirect method of proof, which consists of three basic steps: (1) Plaintiff must establish a prima facie case of discrimination based on race, (2) if he does so, the burden shifts to Defendants to provide a legitimate, non-discriminatory reason for the adverse action, and (3) Plaintiff must then come forward and show the stated reason is pretextual. *See Henderson*, 207 F.3d at 376. Williams seems to suggest – without actually applying either framework in an organized way – that he can make out a claim of discrimination using either the direct method or the indirect method of proof.

### 2. *Did Williams suffer an actionable adverse employment action with respect to his race-based allegation?*

Regardless of whether he proceeds under the direct or indirect method, Williams must show a material adverse employment action to survive summary judgment. *See Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 730 (7th Cir. 2009) ("to succeed on . . . discrimination claims, [the plaintiff] must demonstrate a materially adverse employment action that resulted from the alleged discrimination to survive summary judgment") (citation omitted). As the Seventh Circuit has recognized, "[t]he idea behind requiring proof of an adverse employment

action is simply that a statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000) (collecting cases; emphasis in original).

Indeed, Williams has alleged a great deal of racially-motivated wrongdoing on the part of Lovchik and the ISDH; however, many of his allegations do not rise to the level of *material adversity* required for a viable Title VII claim. On this point, it is well-established that an adverse employment action "must materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001) (citation omitted). Further, the Seventh Circuit has recognized three categories of actionable materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing [him] from using [his] skills and experience, so that the skills are likely to atrophy and [his] career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of [his] present job altered, but the conditions in which [he] works are changed in a way that subjects [him] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [his] workplace environment.

*Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (citation and quotations omitted).

Williams' first EEOC charge, which related to race discrimination, chronicled the alleged adverse employment actions directed at him. Specifically, the EEOC charge listed three potential adverse employment actions: (1) Williams was saddled with additional job responsibilities and employees following the realignment; (2) Lovchik proposed reducing his

salary by roughly $17,000; and (3) following the realignment, Williams supervised nearly all of the African-American employees at ISDH.

First, well-settled Seventh Circuit precedent holds that ramping up an employee's workload does not constitute an adverse employment action under Title VII. *See, e.g., Haugerud v. Amery School Dist.*, 259 F.3d 678, 691-92 (7th Cir. 2001) (additional work did not constitute an adverse employment action for purposes of Title VII); *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (same); *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003) (harder work assignments did not constitute an adverse employment action); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007) (harder work assignments or heavier workload does not amount to an adverse employment action).

Second, because the proposed salary decrease never came to fruition, it cannot constitute an adverse employment action. *See, e.g., Ajayi v. Aramark Business Services., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse."); *Schrader v. Palos Anesthesia Associates, S.C.*, 2004 WL 2167909, at *9 (N.D. Ill. Sept. 24, 2004) (threatened salary reduction that never took place did not constitute an adverse employment action); *Bragg v. Orthopaedic Associates of Virginia, Ltd.*, 2007 WL 702786, at *7 (E.D. Va. March 2, 2007) (describing plaintiff's argument that a threat to reduce her salary amounted to an adverse employment action as "ludicrous"); *Mitchell v. Vanderbilt University*, 389 F.3d 177, 181-182 (6th Cir. 2004) (unimplemented reduction in pay, among other things, failed to give rise to a materially adverse employment action).

Williams' third argument, which relates to supervising most of the African-American employees at ISDH, raises interesting issues. Indeed, it is unlawful for employers to "limit,

segregate, or classify his employees or applicants for employment in any way <u>which would</u> <u>deprive or tend to deprive any individual of employment opportunities or otherwise adversely</u> <u>affect his status as an employee</u>." 42 U.S.C. § 2000e-2(a)(2) (emphasis added). However, § 2000e-2(a)(2) still requires an adverse employment action. *See Dixon v. Illinois State Bd. of Educ.*, 2005 WL 2387686, at *3 (N.D. Ill. Sept. 23, 2005) (citing *Hunt*, 219 F.3d at 654). While Plaintiff emphasizes that most of the African-American were concentrated in specific divisions, he does not meaningfully argue that African-Americans at the ISDH are deprived of employment opportunities or adversely affected in any other way. On this point, Lovchik testified throughout her deposition that many job postings are open to the public on the State's website. Accordingly, the Court rejects the argument that Williams suffered an adverse employment action merely by virtue of receiving more "direct reports" who also happened to be African-American. After all, this would simply be another iteration of the argument that more work responsibility constitutes an adverse employment action, recast in a different form.

Instead, the crux of Williams' argument is that segregating a workforce by race is a "patent violation" of Title VII. To bolster this claim, Williams cites to numerous cases. *See, e.g., Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 912 (7th Cir. 2010) (nursing home's policy of honoring patients' racial preferences supported plaintiff's <u>hostile work environment</u> claim); *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 744 (7th Cir. 1999) (using evidence that employer maintained a segregated workforce <u>to support plaintiff's claim that his discharge</u> was motivated by race); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276-77 (9th Cir. 1981) (under the circumstances, gender was not a *bona fide* occupational qualification reasonably necessary to facilitate normal operations of the business).

Unfortunately, Williams' reliance on these three cases is misplaced. In *Chaney*, the nursing home had an *overt* policy of honoring patients' racial preferences. *Chaney*, 612 F.3d at 910. Equally important, this policy was used to bolster the plaintiff's *hostile work environment claim* – an actionable standalone claim under Title VII. *Chaney* did not deal with a segregated workforce as a standalone claim. Similarly, in the *Johnson* case, the plaintiff merely used evidence of a segregated workforce to bolster the argument that his *discharge* was unlawfully motivated by race. Finally, the *Fernandez* case is altogether inapposite, as it related to whether gender was a bona fide occupational qualification. No similar issue exists in this case.

However, one of the cases that Williams relies on, *Ferrill v. The Parker Group, Inc*., 168 F.3d 468 (11th Cir. 1999), warrants a more in-depth discussion. In *Ferrill*, an employee of TPG, a telephone marketing company, sued for race discrimination under § 1981. *Id*. at 471. Specifically, TPG worked for various political candidates by making "get out the vote" calls. *Id*. TPG had a practice of "race-matching" when it was specifically requested by customers; in other words, black voters were called by black callers and white voters were called by white callers. *Id*. Moreover, black callers were given a "black script" while white callers were given a "white script." *Id*. To facilitate supervision, the company even segregated black callers in one room and white callers in another room. *Id*. Finally, TPG "admitted that the . . . assignments of 'get-out-the-vote' calls and scripts were made on the basis of race and that TPG employees were segregated on the basis of race." *Id*. at 472. Ultimately, the Eleventh Circuit ruled that TPG could be held liable for making race-based job assignments. Notably, the decision did not discuss adverse employment actions.

While perhaps helpful to Williams' case, the Court believes that *Ferrill* is distinguishable for at least two reasons. First, the defendant in *Ferrill* had an overt policy of segregating employees by race. The ISDH has no such policy and Williams has not argued that such a "policy" exists. On this point, there is no real evidence – other than the fact that many of the African-American employees worked in the same departments – that there was any motivation on the part of the ISDH to specifically segregate employees based on race. The Seventh Circuit has repeatedly cautioned district courts that the judiciary does "not sit as a super-personnel department with authority to review an employer's business decision." *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005). Plaintiff's claim in this regard is essentially an invitation to do just that. Second, there is no real allegation that Williams himself – a division director – was segregated from the Caucasian members of the ISDH workforce. To the contrary, at the time he was hired, all other division directors were Caucasian. Presumably, a claim like the one described in *Ferrill* would need to be brought by one of ISDH's African-American employees who was actually segregated from his or her Caucasian counterparts – not one of their supervisors. Finally, it is worth noting that although the Seventh Circuit cited *Ferrill* favorably in its *Chaney* decision, Williams has failed to provide the Court with a Seventh Circuit case that discusses a similar "unlawful job assignment" theory. As discussed in more detail below, Seventh Circuit cases tend to discuss segregated work forces in the context of bolstering either a hostile work environment or some other type of discrimination claim.

Next, Plaintiff cites to the watershed case of *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) (ruling that use of high school diploma and standardized IQ test were violations of Title VII where they had a disparate impact and did not bear "a demonstrable relationship to

successful performance of the jobs for which [they were] used"). By doing so, Plaintiff raises the specter of a disparate impact claim (for whatever reason, Plaintiff calls it an "adverse impact" claim). However, Plaintiff does not develop this argument in a meaningful fashion; therefore, this argument is waived. In any event, this theory also fails on the merits. Disparate impact claims essentially allow "[a]n employee [to] . . . complain about an *employment practice* if while not deliberately discriminatory it bears harder on the members of a protected group, that is, in the jargon of discrimination law, has a 'disparate impact' on that group, and the employer 'fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity.'" *DeClue v. Central Illinois Light Co.*, 223 F.3d 434, 436 (7th Cir. 2000) (emphasis added; citation omitted; absence of restroom facilities could potentially violate Title VII on a disparate impact theory, but plaintiff waived this claim by failing to raise it). Like the plaintiff in *DeClue*, Williams has failed to litigate this case as a "disparate impact" case. *Id.* at 437 ("She has waived what may have been a perfectly good claim of sex discrimination, though that we need not decide."). Notably, here, Williams has failed to articulate a tangible, ostensibly neutral ISDH employment practice that results in a "disparate impact" on African-American employees.

All in all, the Court cannot help but find that Williams' segregation-based allegations belong as part and parcel of a potential *hostile work environment* claim, just as they did in the *Chaney* case. Indeed, Defendants anticipated that Williams would pursue a hostile work environment claim, devoting over three pages of their opening summary judgment brief to the argument that Williams was not subjected to a hostile work environment. (Dkt. 59 at 20-23). For whatever reason, Williams conspicuously failed to respond in kind. In fact, the phrase "hostile

work environment" is not contained in Williams' response brief; nor is it contained in Williams' First Amended Complaint and at oral argument, counsel conceded that he had not raised such a claim. Perhaps fortunately for Lovchik – and unfortunately for Williams – the Court believes it has no choice but to rule that Williams' hostile work environment claim has also been waived. *See Caruso*, 197 F.3d at 1197 (arguments not presented to the district court in response to summary judgment motions are waived); *Declue*, 223 F.3d at 437; *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 347 (7th Cir. 1999) (plaintiff waived hostile work environment claim on appeal because he never developed such a theory in the district court); *Bouso v. Elkay Manufacturing Co.*, 2003 WL 22410076, at *4 (N.D. Ill. Oct. 22, 2003) ("To the extent Bouso wished to allege any hostile work environment theory, the court views such a claim as undeveloped and therefore waived.").

It is worth noting that the two isolated statements made by Lovchik, which Williams perceived as "racially-charged", do not meaningfully strengthen Williams' discrimination claims. The first statement – about a co-worker "turning tricks" – was certainly inappropriate, but nothing suggests that it was related to race. Lovchik's second statement – about Williams' children being black – was perhaps delivered in a clumsy, awkward, and inartful manner. But there is nothing about this statement that raises the specter of racial animus. "[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Hemsworth*, 476 F.3d at 491 (citations omitted). On this point, the Court notes that the Seventh Circuit has given far worse comments relatively short shrift before affirming summary judgment. *Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, 651 F.3d 664, 667 (7th Cir. 2011) (supervisor displayed a

"motivational" sign bearing the tagline "Clebonics" and commented that an African-American's telephone demeanor was "too urban"); *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 829 (7th Cir. 2008) ("Ellis points to comments Baker made that 'there are plenty of good sisters out there' and that Ellis was a 'sell-out' and Craft's purported remark that by 'dating a white girl from the phone center' Ellis was 'messing up his career.'"); *Mlynczak v. Bodman*, 442 F.3d 1050, 1057-58 (7th Cir. 2006) ("Langenfeld, for example, made a number of comments indicating that she was happy that women were being hired, that she would favor a minority candidate over a nonminority candidate, and that it was good for white men to experience a little discrimination.").

To be sure, the laboratory work environment that was cultivated by Lovchik was unpleasant. However, for the reasons set forth above, the Court must **GRANT** summary judgment with respect to Williams' race discrimination claims.

### E. Retaliation

Fortunately for Williams, all is not lost; he is also pursuing various retaliation claims against Defendants. "Unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (citations omitted). As with a discrimination claim, a plaintiff asserting a claim of retaliation under Title VII or § 1981 may choose to prove his case under either direct or indirect methods of proof. *See Weber v. Universities Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). Williams proceeds under the direct method of proof. Under this method, the plaintiff must present evidence, direct or circumstantial, demonstrating that: (1) "he engaged in statutorily protected activity"; (2) "he suffered an adverse

employment action taken by the employer"; and (3) "a causal connection [exists] between the two." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Undoubtedly, Williams engaged in statutorily protected activity by filing an EEOC charge on August 8, 2008. *See Ajayi*, 336 F.3d at 533 (holding that there is "no dispute that [the plaintiff] satisfied the first element by filing her EEOC charge").

With respect to the second requirement, the adverse employment actions claimed by Williams are found in his second EEOC charge, filed on July 17, 2009. In that charge, Williams listed a litany of employment actions that he allegedly endured as a result of filing his first EEOC charge, including: (1) Williams was disciplined in the form of a letter of counseling; (2) ISDH did not consider the results of the human resource department's investigation, but instead lent credence to Lovchik's version of events; (3) Williams received an unfair performance evaluation; (4) ISDH's refusal to consider remedial measures; (5) Williams' reassignment out of the laboratory, which, in his view, would impede his ability to obtain "promotional opportunities, advancements, wage increases, or transfers."

Unfortunately for Williams, most of these are not adverse employment actions, even in the context of retaliation. "While the definition of 'adverse employment action' may be slightly more expansive in the context of a retaliation claim, the fact is that the action must be 'materially adverse' and must carry with it 'tangible job consequence[s].'" *Valcarcel v. Social Development Commission*, 2010 WL 3386592, at *7 (E.D. Wis. Aug. 26, 2010) (quoting *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998)). First, a letter of counseling is not an adverse employment action; nor is a negative performance evaluation. *See, e.g., Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (unfair reprimands or negative performance evaluations, unaccompanied by

some tangible job consequence, are not materially adverse); *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (same); *Sweeney*, 149 F.3d at 556 (7th Cir. 1998) (two counseling statements admonishing plaintiff to improve her performance were not adverse employment actions).

Similarly, Williams' allegations regarding the human resource department's investigation do not rise to the level of an adverse employment action. *See Johnson v. ITT Corp.*, 2011 WL 3875598, at *8 (N.D. Ill. Sept. 1, 2011) (failure of employer to launch an investigation was not an adverse employment action; it was not a "quantitative or qualitative change in the terms or conditions of his employment") (citation and internal quotations omitted); *Glapion v. CSX Transp. Inc.*, 2010 WL 489702, at *5 (N.D. Ill. Feb. 9, 2010) (an investigation is not a materially adverse employment action); *Valcarcel*, 2010 WL 3386592, at *8 (same); *Wilburn v. Fleet Financial Group, Inc.*, 170 F. Supp. 2d 219, 237 (D. Conn. 2001) (employer's alleged failure to conduct an impartial investigation of employee's complaint did not constitute an adverse employment action as required to support a claim for retaliation). These cases apply with equal force to Williams' vague claim that ISDH failed to consider remedial measures.

This leaves Williams' claim that his reassignment on November 24, 2008 – and any potential effect it had on his future career prospects – constitutes an adverse employment action. Here, there is arguably some tension in the case law. On one hand, it is well-settled that mere lateral transfers, even if accompanied by bruised egos and petty slights, are not adverse employment actions. *See, e.g., Flaherty v. Gas Research Institute*, 31 F.3d 451, 457 (7th Cir. 1994) (lateral transfer, where employee's existing title would change and the employee would report to a former subordinate, did not constitute an adverse employment action); *Spring v.*

*Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir. 1989) (no adverse employment action where school principal was transferred to a different school and would share the position with a co-principal).

On the other hand, under certain circumstances, a plaintiff's transfer can be considered an adverse employment action even if his salary and benefits remain steady. For instance, an adverse employment action can occur when an employee's new position is considered less important within the organization, where it requires less skill or brainpower, or where it results in a significant reduction in responsibilities. *See, e.g., Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365 (7th Cir. 2009) (transfer to position that was considered less important in the office hierarchy could be deemed an adverse employment action despite no reduction in the worker's pay); *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 907-08 (7th Cir. 2010) (transfer from a position providing skills necessary for promotion to higher position into a purely clerical position with an increase in pay could be an adverse employment action); *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994) (changing plaintiff's duties from a mix of intellectually stimulating and routine job responsibilities to only routine duties is a "dramatic downward shift in skill level" that "can rise to the level of an adverse employment action"); *Davis v. Harris*, 2006 WL 3321630, at *22 (C.D. Ill. Nov. 14, 2006) ("A significant reduction in responsibilities can constitute an adverse employment action.") (citation omitted).

In the Court's view, Williams' situation bears a stronger resemblance to the latter group of cases. The changes Williams endured as a result of his transfer were more than cosmetic and semantic. As a result of his transfer, Williams lost all supervisory responsibilities; he was moved from a large office into a small cubicle near moving boxes; he was given few instructions, no job

description, and experienced long droughts in his workload; and he was isolated from other ISDH coworkers. Williams' new position had less responsibility, for several months he had no specific work assignments, the position was less interesting, and had less cachet within the ISDH hierarchy.

In this sense, Williams' circumstances are similar to those of the plaintiff in *Collins v. State of Illinois*, 830 F.2d 692 (7th Cir. 1987). In *Collins*, the Seventh Circuit ruled that the evidence raised a jury question as to whether an ostensibly lateral transfer was an adverse employment action where the employee was transferred to a position with no specific duties, taken out of her own office and placed at a receptionist-type desk, denied a telephone, removed from professional publications, and no longer given business cards. *Id*. at 703-04. Here, too, the Court finds that genuine issues of material fact preclude summary judgment on the issue of whether Williams suffered an adverse employment action when he was transferred to a new position on November 24, 2008.

Now, the Court must analyze the third and final element under the direct method of proof: causality. The Court finds that at least five pieces of evidence create genuine issues of fact as to whether Williams' reassignment and his first EEOC charge are causally connected. First, shortly after the first EEOC charge, Lovchik allegedly stated that Williams' "chickens will come home to roost." This statement is potentially damning. Second, Williams was allegedly transferred because his job as division director was not supported by the Public Health Emergency Preparedness Grant. However, after Williams was transferred, Grimes assumed some of his duties. As discussed above, in his affidavit, Grimes stated that he "was paid from the same funding source as [Williams] was." Grimes further noted, "[t]his source . . . should

have been available to fund those same responsibilities no matter who performed them, whether performed by [Williams] or another State Department of Health Lab Employee." This suggests that the reason given for Williams' transfer was pretextual.

Third, Lovchik testified that she recommended Williams to Gary Couch, the director of PHPER, for this position, testifying that "I thought [Williams] would do very well in his division because he was very enthusiastic about preparedness." (Dkt. 67-2 at 27). This recommendation is curious, given Lovchik's negative assessment of Williams' competency in his 2008 performance evaluation. Fourth, sometime before September 25, 2008, Williams met with Lance Rhodes. While informing Williams that his salary would not be immediately reduced, Rhodes also asked for his resignation on five separate occasions at this one meeting. If true, this is strong evidence that ISDH was eager to push Williams out the door. Fifth, the temporal proximity between the EEOC charge (August 8, 2008) and the transfer (November 24, 2008), a period of less than four months, is arguably telling. In the Court's view, this gap in time is not long enough to automatically sever the causal link between Williams' EEOC charge and his subsequent transfer. *See Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 n.6 (7th Cir. 1996) (even long lapses in time not fatal if there is proof of a causal link). For these reasons, the Court **DENIES** summary judgment on Williams' retaliation claim relating to his transfer on November 24, 2008.

## IV.    CONCLUSION

For the reasons set forth below, Defendants' Motion for Summary Judgment (Dkt. 58) is **GRANTED** in part and **DENIED** in part. Williams' claim for retaliation arising out of his November, 24 2008 transfer will survive for trial. Summary judgment is granted with respect to

all remaining claims.  Finally, given the Court's ruling, it need not address in detail the issues

presented by Defendants' Motion to Strike Plaintiff's Affidavit.  Such motions are disfavored by

the local rules. *See* L.R. 56.1(f) ("Collateral motions in the summary judgment process, such as

motions to strike, are disfavored.").  Suffice it to say, the Court has endeavored to consider the

admissible portions of Williams' affidavit while disregarding the inadmissible portions.

Accordingly, Defendants' Motion to Strike the Affidavit of Micah Williams (Dkt. 72) is

**DENIED** as moot.


SO ORDERED.     11/17/2011


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


Copies to:

Laura Lee Bowker
INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov,laurabowker@hotmail.com,Troyellen.Daniels@atg.in.gov

Betsy M. Isenberg
INDIANA OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov,Victoria.Hoffman@atg.in.gov

James D. Masur , II
ROBERT W. YORK & ASSOCIATES
jmasur@york-law.com